[663 NYS2d 610]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JERMAINE KING, Appellant.

Second Department, October 6, 1997

### APPEARANCES OF COUNSEL

*Robert N. Isseks,* Middletown, for appellant.

*Jeanine Pirro, District Attorney* of Westchester County, White Plains *(Gregory H. Babikian* and *Maryanne Luciano* of counsel), for respondent.

### OPINION OF THE COURT

SANTUCCI, J.

On this appeal we consider the question of whether a blood sample taken from a defendant in the investigation of an uncharged crime may be used as evidence against him in another prosecution. On the facts of this case, we conclude that this question should be answered in the affirmative.

### *Factual Background*

By Westchester County Indictment No. 93-0689 the defendant was charged with two counts of rape in the first degree, two counts of sodomy in the first degree, robbery in the first degree, and burglary in the first degree. The charges arose out of an incident which occurred on May 22, 1991, in Yonkers, New York, when the then-14-year-old defendant entered the complainant's apartment (hereinafter referred to as the May complainant), held a knife to her throat, forced her to submit to sexual intercourse and oral sex, and stole $140 from the premises. As part of their investigation the police removed the sheets which were on the complainant's bed during the attack, as well as the underpants and nightshirt she was wearing at that time.

Three months later, in August 1991, detectives from the Police Department of the City of Yonkers responded to another reported rape and robbery which occurred in an apartment located in the lower portion of a house occupied by the defendant and his family. The victim of that attack (hereinafter referred to as the August complainant) described her assailant as a "[t]all, thin [young] black male", a description similar to the one which had been provided to the police by the May complainant. The August complainant also stated that her assailant had a distinctive body odor which she described as an "industrial odor".

After interviewing the August complainant and taking into evidence the complainant's nightgown, the police questioned the defendant, Jermaine King, and obtained permission from a visiting aunt, to search the King apartment. In the course of this search the detectives seized some mothballs from one of the defendant's dresser drawers. Also taken into evidence was some discarded clothing which was found in the basement of the house where the trash cans were located. The August complainant later identified the mothball smell as the "industrial odor" which had emanated from her assailant, and the clothing as that which had been worn by her assailant during the attack. (The defendant was ultimately not indicted for the August 22, 1991 incident).

Shortly thereafter the police contacted the office of the Westchester County District Attorney to coordinate the two rape investigations. It was then determined that the bedding and clothing gathered from both reported rapes had been delivered to the Westchester County Department of Laboratories and Research by the Yonkers police. The District Attorney's office contacted the laboratory and spoke to a forensic scientist, an expert in the field of DNA analysis, who advised that there was sufficient material in each of two items bearing semen stains (one from each case) to conduct a DNA analysis for comparison with a blood sample.

### Procedural Background

Based upon the scientific opinion offered by the crime laboratory, the People moved for an order compelling the defendant to permit the taking of blood samples from his body for a comparison with tests to be performed on the nightgown belonging to the August complainant. The People concluded that there was no probable cause to secure an order compelling the defendant to give a blood sample with respect to the alleged attack on the May complainant.

The affirmation of the Assistant District Attorney in support of the motion set forth other information which had been gathered in connection with the August incident—e.g., that the perpetrator had said things during the attack which required a knowledge of the complainant's personal background and her recent daily activities in the apartment building, and that a neighbor had seen the defendant near the building's trash cans at a time immediately after the perpetrator had fled the complainant's apartment. The motion papers made no mention of the rape which allegedly took place in May 1991.

In a well-reasoned decision dated April 3, 1992, the County Court, Westchester County (LaCava, J.), determined that a sufficient showing had been made by the People to take the requested blood samples from the defendant for the purpose of forensic testing and analysis. Thereafter the court entered an order to this effect dated December 16, 1992. In the order the court noted that it had "been advised that defense counsel does not oppose this application, and has reviewed this order before the Court has signed it".

The blood samples were obtained on December 29, 1992. The District Attorney's office directed the laboratory to analyze and compare the defendant's blood against the stains recovered from both cases. When an analysis of the stain on the evidence recovered from the August incident was attempted, it was discovered that the stain did not contain sufficient material for a DNA analysis. However, analysis of the stain from the alleged rape of the May complainant revealed a positive match with the defendant's blood. On May 25, 1993, the defendant was arrested in connection with the May 1991 incident.

Prior to trial the defendant filed an omnibus motion, which sought, *inter alia,* to suppress the results of the DNA analysis. The defendant argued that probable cause for the issuance of the order to take a blood sample from him (hereinafter the blood order) was predicated upon evidence seized as a result of an illegal arrest and interrogation, and an unlawful search of his apartment. The defendant also argued that the result of the DNA analysis must be suppressed because the application for the blood order was based on information allegedly linking the defendant to the alleged August 1991 rape, and not upon probable cause that he had committed the crime at bar, i.e., the May 1991 rape.

The County Court ordered that a pretrial evidentiary hearing be conducted to determine the admissibility of the DNA ev-

idence. Based upon the testimony adduced at that hearing, the court denied the motion to suppress. In pertinent part the court reasoned as follows:

"[S]ome of the information averred in support of the People's application appears to have been infected by one or more constitutional infirmities, which would render it inadmissible at trial and unavailable for consideration on this court's inquiry into the validity of the Blood Order. However, assuming—without deciding—that such infirmities have been established, the court finds that, 'the application contained sufficient lawfully obtained information, untainted by and independent of the illegality to constitute probable cause' * * *

"This court is unaware of, and the defendant does not cite, any authority which supports the proposition that probable cause must be shown anew for each subsequent use to which a blood sample might be put once it has been lawfully taken. Moreover, the underlying rationale for the probable cause requirement is the constitutional right to be free from an unreasonable seizure of one's person (*Matter of Abe A.,* [56 NY2d 288] at 295). Since there was probable cause to issue the Blood Order, the seizure of defendant's person pursuant thereto was not unreasonable. It is, therefore, irrelevant whether such probable cause related to the May rape or the August rape. Furthermore, there is no concomitant right concerning the disposition of a blood sample, lawfully seized, such as would immunize the donor from the consequences of its use in unrelated police investigations". (161 Misc 2d 448, 452-453.)

After trial the jury returned a verdict convicting the defendant of rape in the first degree (two counts), sodomy in the first degree, and a related charge in connection with the May incident.

On appeal the defendant again argues that the results of the DNA analysis should have been suppressed because the application for the blood order was based upon illegally obtained evidence, and thus there was inadequate probable cause to issue such an order in connection with the attack upon the May complainant. He also contends that the prosecutor was aware that the blood/semen sample from the August incident contained insufficient serological evidence with which to compare a sample of the defendant's blood. Therefore, defendant concludes that the People, in bad faith, used the probable cause that existed in connection with the uncharged August 22, 1991 attack to secure the blood order, and employed the results to prosecute the defendant in the instant matter. We disagree.

## Issuance of the Blood Order

It is well settled that a court order to obtain a blood sample of a suspect "may issue provided the People establish (1) probable cause to believe the suspect has committed the crime, (2) a 'clear indication' that relevant material evidence will be found, and (3) the method used to secure it is safe and reliable" *(Matter of Abe A.,* 56 NY2d 288, 291, *supra; see also, Matter of Chaplin v McGrath,* 215 AD2d 842; *Matter of Vivanco v West,* 214 AD2d 618). In addition, the issuing court must weigh the seriousness of the crime, the importance of the evidence to the investigation, and the availability of less intrusive means of obtaining it, against concern for the suspect's constitutional right to be free from bodily intrusion *(Matter of Abe A., supra,* at 291). The determination that probable cause exists is entitled to great deference *(see, People v Hanlon,* 36 NY2d 549, 559).

Assuming, arguendo, that the defendant is correct that the police conducted an illegal search of his apartment and that his statements to them should be suppressed, we agree, nevertheless, that " 'the application [for the blood order] contained sufficient lawfully obtained information, untainted by and independent of the [alleged] illegality to constitute probable cause' " (161 Misc 2d, *supra,* at 452-453). For example, the defendant fit the general description of the perpetrator as given by the August complainant, he lived in the same building as this individual (a significant factor since, during the attack, the perpetrator identified the August complainant by her first name and indicated that he knew several of her family members had recently visited her), a knife used by the rapist and the defendant's clothing were found in the basement of the house, and neighbors observed the defendant outside the premises immediately before and after the attack. In view of these facts and mindful that "[p]robable cause does not require proof sufficient to warrant a conviction beyond a reasonable doubt but merely information sufficient to support a reasonable belief" *(People v Bigelow,* 66 NY2d 417, 423), the County Court correctly found that there was probable cause to issue the blood order.

The record also reveals that, at the time the application for the blood order was made, there was a "clear indication" that relevant material evidence would be found with respect to the alleged attack upon the August complainant, the crime for which the blood sample was requested and drawn. Furthermore, the defendant does not contend that the method used to obtain the blood sample was either unsafe or unreliable. Therefore, the blood order was properly issued.

Although it was later discovered that the stain on the night-shirt recovered from the August complainant did not contain sufficient material for analysis, nevertheless, the County Court also properly found that the "defendant [had been] unable to establish either that [the forensic scientist's] initial evaluation was erroneous or untruthful, or that the People otherwise acted in bad faith" (161 Misc 2d, *supra*, at 454, n 3). The testimony adduced at the suppression hearing clearly indicates that both the forensic scientists and the District Attorney believed in good faith that the stain samples obtained as a result of the investigation into the August incident would contain sufficient material for testing in that case.

### Use of the Blood Sample

We also conclude that it was neither unreasonable nor impermissible to utilize the defendant's blood sample, which had been lawfully seized from his person, in the investigation into the alleged rape of the May complainant. The Fourth Amendment to the United States Constitution expressly provides that "[t]he right of the people to be secure in their persons * * * against unreasonable searches and seizures, shall not be violated". The overriding function of this Amendment (as well as the corresponding provision in the New York State Constitution) is to protect *personal privacy* from unwarranted intrusion by the government *(see, Schmerber v California,* 384 US 757; *see also, Matter of Abe A.,* 56 NY2d 288, *supra).* Indeed, "[t]he security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society" *(Wolf v Colorado,* 338 US 25, 27).

It is beyond cavil that an individual has a legitimate privacy expectation with respect to the blood flowing through his or her own veins, and a corresponding right to be free from the unreasonable search and seizure of such bodily fluids. Accordingly, an "intrusion" into an individual's body for the purpose of obtaining a blood sample can only be authorized if the People meet the stringent standards set forth above *(Matter of Abe A., supra,* at 291). Where, as here, these criteria have been met and an order authorizing the taking of a blood sample has issued via lawful judicial process, the personal privacy interest must yield to the greater governmental interest demonstrated.

It is also clear that once a person's blood sample has been obtained lawfully, he can no longer assert either privacy claims or unreasonable search and seizure arguments with respect to the use of that sample. Privacy concerns are no longer rele-

vant once the sample has already lawfully been removed from the body, and the scientific analysis of a sample does not involve any further search and seizure of a defendant's person. In this regard we note that the defendant could not plausibly assert any expectation of privacy with respect to the scientific analysis of a lawfully seized item of tangible property, such as a gun or a controlled substance. Although human blood, with its unique genetic properties, may initially be qualitatively different from such evidence, once constitutional concerns have been satisfied, a blood sample is not unlike other tangible property which can be subject to a battery of scientific tests. In this regard it bears noting that the defendant's sample was contemporaneously tested against all the stain evidence seized during both investigations in a single scientific procedure.

Furthermore, while CPL 160.50 requires that a defendant's fingerprints and photographs be returned when a criminal proceeding is terminated in the defendant's favor, there are no constitutional provisions or legal precedents "concerning the disposition of a blood sample, lawfully seized, [which] would immunize the donor from the consequences of its use in unrelated police investigations" (161 Misc 2d, *supra,* at 453, *cf., People v Dozier,* 131 AD2d 587). Indeed, "[a] defendant has no inherent or constitutional right to the return of photographs, fingerprints, or *other indicia of arrest* where charges are dismissed" *(People v Patterson,* 78 NY2d 711, 715 [emphasis supplied]). Moreover, a defendant does not have a right to the automatic return of property seized in any criminal case absent a proper demand or some legal action *(see,* CPL 160.50; *Matter of DeBellis v Property Clerk of City of N. Y.,* 79 NY2d 49; *Moreno v City of New York,* 69 NY2d 432).

For all of the above reasons we perceive no merit to the defendant's claim that his blood sample was improperly tested against stain evidence obtained from the investigation into the alleged rape of the May complainant, despite the fact that the blood order was issued based upon information garnered from the investigation into the attack upon the August complainant.

The defendant's remaining contentions are without merit.

Accordingly, the judgment is affirmed.

BRACKEN, J. P., RITTER and ALTMAN, JJ., concur.

Ordered that the judgment is affirmed.