**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0938**

State of Minnesota,
Appellant,

vs.

Debra Lee Fawcett,
Respondent.

**Filed January 11, 2016
Reversed and remanded
Willis, Judge\***

Anoka County District Court
File No. 02-CR-14-6757

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Anthony C. Palumbo, Anoka County Attorney, Kelsey R. Kelley, Assistant County Attorney, Anoka, Minnesota (for appellant)

Mark D. Nyvold, Fridley, Minnesota (for respondent)

Considered and decided by Stauber, Presiding Judge; Kirk, Judge; and Willis, Judge.

**S Y L L A B U S**

When a blood sample is lawfully obtained, a chemical analysis of the sample that does not offend standards of reasonableness is not a distinct Fourth Amendment event requiring a warrant.

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

# O P I N I O N

**WILLIS**, Judge

The state appeals from the district court's pretrial order suppressing blood-test results in the prosecution of respondent Debra Lee Fawcett for criminal vehicular operation. We conclude that the district court erred by holding that Fawcett retained privacy interests in her blood after it was lawfully obtained under a search warrant. Accordingly, no additional warrant was required to justify the chemical analysis of her blood. Therefore, we reverse and remand.

## FACTS

On May 24, 2014, at approximately 5:08 p.m., Blaine Police Officer Matzke was dispatched to a two-vehicle accident. Officer Matzke observed that the driver of a vehicle with heavy damage was bleeding and obviously injured. The driver told Officer Matzke that she was driving through an intersection when she "t-boned" a vehicle that ran a red light.

Blaine Police Officer Hawley was also dispatched to the accident. Officer Hawley spoke with the driver of the second vehicle and identified her as respondent Debra Lee Fawcett. Fawcett was uncooperative with Officer Hawley's attempts to assess her possible injuries and kept asking to call her daughter, who it was later determined had recently died. Fawcett stated that she had been at a car lot with her daughter but could not identify where the car lot was. When Officer Hawley asked Fawcett where she had been going, Fawcett repeatedly stated only that she wanted to call her daughter.

Officer Hawley believed that she smelled the odor of an alcoholic beverage coming from Fawcett. Officer Matzke believed that he smelled a hint of an alcoholic beverage emanating from Fawcett's vehicle. Officer Matzke asked Fawcett if she had come from the VFW club nearby and how many drinks she had earlier. Fawcett stated that she had not come from the VFW but that she had had two or three beers. While conversing with her, Officer Matzke believed that he detected the odor of an alcoholic beverage on Fawcett's breath.

Officer Matzke contacted Blaine Police Detective Johann to discuss bringing criminal-vehicular-operation charges against Fawcett. Detective Johann directed Officer Matzke to read Fawcett the implied-consent advisory and indicated that in the meantime, he would seek a search warrant for the blood draw. At 5:29 p.m., Officer Matzke read the implied-consent advisory to Fawcett, who had been loaded into an ambulance. Officer Matzke informed Fawcett that Minnesota law required her to take a test to determine if she was under the influence of alcohol, but he did not read the portion of the advisory about testing to determine if she was under the influence of a controlled substance. Officer Matzke then read, "Because I also have probable cause to believe you have violated the criminal vehicular homicide or injury laws, a test will be taken with or without your consent."

Fawcett told Officer Matzke that she wanted to contact an attorney. At the hospital, Officer Matzke made a phone available to Fawcett. Fawcett was unable to reach her attorney and said that she was finished using the phone. At approximately 6:27 p.m.,

3

Fawcett agreed to submit to a blood test. Officer Matzke waited to request a blood draw by medical personnel until Detective Johann could obtain a search warrant.

In his application for a search warrant and supporting affidavit, Detective Johann stated the following facts: There had been a motor-vehicle crash and one or more persons suffered bodily harm as a result of the crash. Officers identified Fawcett as the driver of one of the vehicles and stated that she admitted that she had two or three drinks "just prior to" the crash. Fawcett smelled of an alcoholic beverage. Officers at the scene believed that Fawcett had been drinking. Detective Johann applied for the warrant on the grounds that Fawcett's blood sample "constitutes evidence which tends to show a crime has been committed, or tends to show that a particular person has committed a crime." He also stated that he sought a blood sample "as evidence of the crime of criminal vehicular operation/homicide."

The search warrant was granted and authorized a blood sample to be taken from Fawcett and forwarded "to an approved lab for testing." The search warrant states that the affidavit and application were "incorporated by reference into this search warrant." It also states that Fawcett's blood sample "constitutes evidence which tends to show a crime has been committed, or tends to show that a particular person has committed a crime." Finally, the search warrant states that "due to the dissipation of alcohol/drugs in the human body this warrant may be served at anytime during the day or night."

Detective Johann arrived at the hospital at approximately 6:45 p.m. with the search warrant authorizing a blood draw. Fawcett requested a breath test. Officer Matzke administered a preliminary breath test and the result was a reading of 0.00. Fawcett denied

4

to Detective Johann that she was intoxicated, and Detective Johann did not personally observe any signs of impairment. Nevertheless, a hospital employee then took a sample of Fawcett's blood. Following the blood draw, Fawcett told the officers that she was upset and depressed about the death of her daughter three months earlier. Fawcett also stated that she was on Lorazepam and Wellbutrin. The officers gave Fawcett a copy of the warrant.

Detective Johann received a Bureau of Criminal Apprehension (BCA) report on June 24, 2014, indicating that Fawcett's blood contained no alcohol and that additional toxicology reports would follow. Detective Johann received a second BCA report on September 9, 2014, indicating the presence in Fawcett's blood at the time of the accident of a metabolite of tetrahydrocannabinol (THC) and Alprazolam, both of which are controlled substances under Minnesota law. *See* Minn. Stat. § 152.02, subd. 2(h), subd. 5(c)(2) (2014). A subsequent investigation into Fawcett's prescription history revealed a valid prescription for Alprazolam.

The state charged Fawcett with criminal vehicular operation, in violation of Minn. Stat. § 609.21, subd. 1(2)(ii) (2012).[1] The complaint indicated that although Fawcett had a valid prescription for Alprazolam at the time of the crash, "the terms of the . . . prescription were violated when she consumed THC." Fawcett moved the district court to suppress all evidence of the presence of drugs in the blood sample. The district court conducted a contested omnibus hearing on January 29, 2015. No testimony was presented

---

[1] Renumbered as Minn. Stat. § 609.2113, effective August 1, 2014.

at the hearing.  The state submitted police reports as an exhibit and Fawcett stipulated that the reports were factually accurate.  The district court granted Fawcett's motion to suppress the evidence, finding that the blood sample was lawfully obtained under the search warrant and that testing of the blood sample for alcohol was lawful but that the subsequent testing of the blood sample for the presence of drugs was unlawful.  This pretrial appeal follows.

**ISSUE**

Did the district court err by concluding that the search warrant authorizing a blood draw did not support testing of the blood sample for the presence of controlled substances?

**ANALYSIS**

Because this is a pretrial appeal by the state, we must first determine whether the suppression of the controlled-substance test results will have a critical impact on the state's case.  *State v. Stavish*, 868 N.W.2d 670, 674 (Minn. 2015).  A pretrial order may be appealed only when the state shows "the district court's alleged error, unless reversed, will have a critical impact on the outcome of the trial." Minn. R. Crim. P. 28.04, subd. 2(b).  The parties agree, as do we, that the suppression of evidence will have a critical impact on the outcome of the trial.

"When reviewing a district court's pretrial order on a motion to suppress evidence, we review the district court's factual findings under a clearly erroneous standard and the district court's legal determinations de novo."  *State v. Gauster*, 752 N.W.2d 496, 502 (Minn. 2008) (quotation omitted).  "We may independently review facts that are not in dispute, and determine, as a matter of law, whether the evidence need be suppressed." *Id.* (quotation omitted).  Notably, Fawcett does not challenge the legality of the blood draw or

6

the legality of chemical analysis of the blood to determine her alcohol concentration but argued only that the chemical analysis of her blood for controlled substances was unlawful.[2] The state argues that, regardless of the scope of the search warrant in this case, once the state has lawfully obtained a person's blood sample for the purpose of chemical analysis, the person has lost any legitimate expectation of privacy in any test results from that sample. This is a matter of first impression for this court.

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; *see also* Minn. Const. art. I, § 10. An individual may invoke the Fourth Amendment by showing "that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S. Ct. 469, 472 (1998). "The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." *Schmerber v. California*, 384 U.S. 757, 767, 86 S. Ct. 1826, 1834 (1966).

There is no shortage of legal analysis concerning compelled blood draws. *See, e.g.*, *Missouri v. McNeely*, 133 S. Ct. 1552 (2013); *State v. Stavish*, 868 N.W.2d 670 (Minn. 2015); *State v. Trahan*, 870 N.W.2d 396 (Minn. App. 2015), *review granted* (Minn. Nov. 25, 2015). But there is no binding authority of which we are aware considering whether

---

[2] The issue of whether Fawcett consented to the blood draw was not argued or briefed by the parties.

7

the chemical analysis of blood is a Fourth Amendment event distinct from the blood draw itself.

The district court focused its analysis primarily on whether the warrant was sufficiently particular to authorize the testing of Fawcett's blood for drugs in addition to alcohol. The district court briefly considered the state's argument about the loss of an expectation of privacy. The state relied on *Harrison v. Comm'r of Pub. Safety*, 781 N.W.2d 918 (Minn. App. 2010), in its argument to the district court and again relies on *Harrison* here. Harrison was arrested twice for driving while impaired and twice consented to a blood test to determine his alcohol concentration. *Harrison*, 781 N.W.2d at 919. On appeal, Harrison did not contend that the blood samples were unlawfully seized but argued that a warrant was required for subsequent testing of his blood samples for alcohol concentration. *Id.* This court concluded that

> when the state has lawfully obtained a sample of a person's blood under the implied-consent law, specifically for the purpose of determining alcohol concentration, the person has lost any legitimate expectation of privacy in the alcohol concentration derived from analysis of the sample. . . . Absent such a privacy interest, any testing of the blood sample for its alcohol concentration is not a search that implicates constitutional protection, and Harrison's assertion that his constitutional rights were violated by the warrantless testing of his blood sample is without merit.

*Id.* at 921. The district court limited its discussion of the privacy rights issue to an analysis of *Harrison* and concluded that *Harrison* was not persuasive because its holding was limited to blood samples obtained under the suspicion of alcohol use and obtained only for the purpose of alcohol testing. While *Harrison* is persuasive, it is not binding on this issue

8

because the court there relied on the authority of the implied-consent law for the search. *Id.* Further, Fawcett does not contend that the testing of her blood sample for alcohol was unlawful but argues only that the subsequent testing of her blood sample for controlled substances was unlawful.

In *Schmerber*, the United States Supreme Court recognized that the administration of a blood test incident to a lawful arrest constituted a search but held that the search could be conducted without a warrant due to exigent circumstances. 384 U.S. at 770-71, 86 S. Ct. at 1835-36. The Court distinguished intrusions into the human body from other types of property for Fourth Amendment purposes, stating that the inquiry regarding intrusions into the human body is a two-fold analysis: (1) whether the police were justified in requiring the blood test; and (2) whether the "means and procedures" employed in taking the blood were reasonable under the Fourth Amendment. *Id.* at 768, 86 S. Ct. at 1834. The Court treated the seizure and separate search of the blood as a single event for Fourth Amendment purposes. *Id.* Under *Schmerber*, any chemical analysis of a lawfully obtained blood sample need only be reasonable.

In *Skinner v. Ry. Labor Execs.' Ass'n*, the Supreme Court considered the warrantless blood testing of railroad employees involved in certain train accidents. 489 U.S. 602, 606-34, 109 S. Ct. 1402, 1407-22 (1989). The Supreme Court noted that it is well established that "a 'compelled intrusio[n] into the body for blood to be analyzed for alcohol content'" is a search. *Id.* at 616, 109 S. Ct. at 1412 (quoting and citing *Schmerber*, 384 U.S. at 767-68, 86 S. Ct. at 1833-34). The Supreme Court further discussed obtaining evidence from a person's body:

> In light of our society's concern for the security of one's person . . . it is obvious that this physical intrusion, penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize as reasonable. The ensuing chemical analysis of the sample to obtain physiological data is a *further invasion* of the tested employee's privacy interests.

*Id.* at 616, 109 S. Ct. at 1413 (emphasis added) (citing *Terry v. Ohio*, 392 U.S. 1, 9, 88 S. Ct. 1868, 1873 (1968)). The Court's "further invasion" language arguably could compel a conclusion that a subsequent chemical analysis of blood is a distinct Fourth Amendment event. But viewing the language in the context of the entire opinion, the language is dictum. The "further invasion" language concerned testing for medical facts about a person unrelated to the government's investigation for alcohol or drugs. *Id.* at 616-17, 109 S. Ct. at 1413. Importantly, the Court did not apply this principle to the legal issue under consideration in *Skinner* because the case involved testing only for alcohol and drugs and not testing for medical facts. *Id.* The Court concluded in *Skinner* that no warrant was required for blood or urine testing because such testing was justified by the government's special need to regulate the conduct of railroad employees to ensure safety by "prevent[ing] accidents and causalities in railroad operations that [may] result from impairment of employees by alcohol or drugs." *Id.* at 620-21, 109 S. Ct. at 1415 (quoting 49 C.F.R. § 219.1(a) (1987)). The Court's legal conclusions regarding alcohol and drug testing of railroad employees to ensure railroad safety have no bearing on the issue presented in this case.

Courts in other jurisdictions have similarly concluded that *Schmerber* compels the conclusion that the subsequent chemical analysis of a lawfully obtained blood sample has

10

no independent Fourth Amendment significance. In *United States v. Snyder*, 852 F.2d 471 (9th Cir. 1988), the Ninth Circuit Court of Appeals stated that finding a separate Fourth Amendment event in a chemical analysis "divide[s] [the] arrest, and the subsequent extraction and testing of [the] blood, into too many separate incidents." *Snyder*, 852 F.2d at 473. The court there concluded that because *Schmerber* viewed the seizure and chemical analysis of the blood as a single Fourth Amendment event, it too must do so. *Id.* at 473-74. Other courts, citing but not relying on *Schmerber*, nonetheless reached the same conclusion. In *People v. King*, 663 N.Y.S.2d 610 (N.Y. App. Div. 1997), a New York court held that "[p]rivacy concerns are no longer relevant once the sample has already lawfully been removed from the body, and the scientific analysis of a sample does not involve any further search." *King*, 663 N.Y.S.2d at 614. Similarly, in *State v. Barkley*, 551 S.E.2d 131 (N.C. App. 2001), the North Carolina Court of Appeals held that "[o]nce the blood was lawfully drawn from [appellant's] body, he no longer had a possessory interest in that blood." *Barkley*, 551 S.E.2d at 135; *see also State v. Hauge*, 79 P.3d 131 (Haw. 2003); *State v. Sanders*, Nos. 93-2284-CR, 93-2286-CR, 1994 WL 481723 at *5 (Wis. Ct. App. Sept. 8, 1994) ("We agree with the trial court that, once the police came into lawful possession of the blood samples, Sanders lost any expectation of privacy he may have had in them, at least insofar as testing for intoxicants—whether alcohol or drug-related—is concerned.").[3]

---

[3] We cite *Sanders*, an unpublished case, only for its persuasive value.

Once a blood sample has been lawfully removed from a person's body, a person loses an expectation of privacy in the blood sample, and a subsequent chemical analysis of the blood sample is, therefore, not a distinct Fourth Amendment event. The district court considered that such a rule necessarily means that a person's blood could "thereafter be tested without a warrant for any purpose at any time, such as future drug testing or DNA comparisons." Although such circumstances are not before us, we note that *Schmerber* dictates that a standard of reasonableness controls and that an unnecessary invasion of privacy interests would most certainly raise concerns of reasonableness. *See Schmerber*, 384 U.S. at 768, 86 S. Ct. at 1834; *see also Sanders*, 1994 WL 481723 at \*5. We conclude that in this case the test for controlled substances does not raise concerns of reasonableness.

Because we conclude that the chemical analysis of a lawfully obtained blood sample is not a distinct Fourth Amendment event requiring a warrant, we need not consider whether the search warrant in this case was sufficiently particular or whether exigent circumstances justified a warrantless chemical analysis of Fawcett's blood. If the state lawfully obtains a blood sample for the purpose of chemical analysis, then a chemical analysis of the sample that does not offend standards of reasonableness is not a separate search requiring a warrant. *See State v. McMurray*, 860 N.W.2d 686, 691 (Minn. 2015) (citing *Katz v. United States*, 389 U.S. 347, 360, 88 S. Ct. 507, 516 (1967) (Harlan, J., concurring)) (stating that a person must have a reasonable expectation of privacy in the area or item searched in order to invoke Fourth Amendment protections).

12

**D E C I S I O N**

The district court erred by concluding that Fawcett retained privacy interests in the contents of her lawfully obtained blood sample and by suppressing the evidence of the chemical contents of Fawcett's blood. We therefore reverse the district court's order and remand for further proceedings consistent with this opinion.

**Reversed and remanded.**