# IN THE COURT OF APPEALS OF IOWA

No. 21-0925
Filed December 7, 2022

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**NEIL MARK WENZEL,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Dickinson County, Andrew J. Smith,

District Associate Judge.

A defendant appeals the denial of his motion to suppress. **AFFIRMED.**

Matthew G. Sease of Sease & Wadding, Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Zachary Miller, Assistant Attorney

General, for appellee.

Heard by Bower, C.J., and Vaitheswaran, Tabor, Greer, Ahlers, Badding,

and Chicchelly, JJ.

**GREER, Judge.**

Did a second test for controlled substances and drugs on blood drawn pursuant to a warrant, initially tested just for blood alcohol content (BAC), violate Neil Wenzel's constitutional rights under the Fourth Amendment and article I, section 8? Prefacing this as an important case of first impression, Wenzel appeals from the denial of his motion to suppress the results of a chemical analysis for controlled substances and drugs, as well as his subsequent conviction of operating while intoxicated (OWI), second offense, in violation of Iowa Code section 321J.2(1) and (2)(b) (2020).[1] To narrow the focus, he contends that while the initial stop, blood draw, and test for alcohol were proper, a second test for controlled substances and drugs was not. Drilling down further, Wenzel argues the separate test for controlled substances was not supported by probable cause, thus it violated both his federal Fourth Amendment and state article I, section 8 constitutional rights. The State asserts that probable cause existed but, even so, individuals lose their expectation of privacy to the intoxicants in their blood after it has been lawfully removed, and so the chemical analysis is not a distinct search for our constitutional analysis. And, the State contends seizing blood under a valid

---

[1] Iowa Code section 321J.2(1) provides:

> A person commits the offense of operating while intoxicated if the person operates a motor vehicle in this state in any of the following conditions:
> a. While under the influence of an alcoholic beverage or other drug or a combination of such substances.
> b. While having an alcohol concentration of .08 or more.
> c. While any amount of a controlled substance is present in the person, as measured in the person's blood or urine.

It has been said that the purpose of chapter 321J is "to reduce the holocaust on our highways." *State v. Kelly*, 430 N.W.2d 427, 429 (Iowa 1988) (citation omitted).

search warrant to test for intoxication, followed by testing for drugs, is reasonable. We do not address head on Wenzel's argument that the chemical analysis is part of a constitutional search; instead, we hold the blood test for controlled substances was both authorized by the warrant and the testing did not exceed the scope authorized by the issuing judge as supported by probable cause, and so we affirm Wenzel's conviction and sentence.

**I. Background Facts and Proceedings.**

No one contests the facts. In May 2020, Wenzel was pulled over by Deputy Shawn Syverson after failing to yield to an emergency vehicle. When Deputy Syverson spoke to Wenzel, he noticed Wenzel's watery and bloodshot eyes, his slurred speech, and the smell of alcohol. Wenzel admitted he had a beer earlier in the day. With those observations and Wenzel's admission, Deputy Syverson asked Wenzel to complete field sobriety tests; Wenzel refused. After Deputy Syverson requested Wenzel submit to a breath test, Wenzel again refused. Rather than invoking implied consent, Deputy Syverson applied for a search warrant to draw and test Wenzel's blood. To obtain the warrant, Deputy Syverson filled out several pages of the warrant application. He specifically requested a blood specimen after confirming on the form that there was probable cause to believe a traffic violation under Iowa Code section 321J.2 occurred. In the first attachment to the application, the provided language on the form stated the need for testing was to aid the investigation and determine what role the use of alcoholic beverages, controlled substances, or drugs played in the traffic offense.

Next, Deputy Syverson completed a second attachment—"A-2 OBSERVATIONS OF IMPAIRMENT"—and on this form the application provided

boxes to check for observations of different indicators of impairment. Here, it was noted that Wenzel refused all field sobriety tests. Deputy Syverson checked several items that were "observations of Suspect establishing probable cause that Suspect is under the influence of an alcoholic beverage, and/or controlled substance and/or drug." He checked boxes for bloodshot eyes, watery eyes, slurred speech, smell of alcohol coming from the suspect, judgment impaired, and poor driving behavior.

**ATTACHMENT A-2 – OBSERVATIONS OF IMPAIRMENT**

The Suspect was transported to: Lakes Regional Hospital 2323 Hwy 71 South, Spirit Lake, IA 51360
The following officer(s) are certified in Iowa Code § 321J.2 in the same manner as Affiant. Officer(s) made the following observations of Suspect establishing probable cause that Suspect is under the influence of an alcoholic beverage, and / or controlled substance and / or drug:
Officer(s):

- Deputy Shawn Syverson _____
- _____
- _____

Time observations began: 2110 _____

- [✓] Bloodshot eyes
- [✓] Watery eyes
- [✓] Slurred speech
- [ ] Mumbling speech
- [✓] Smell of alcoholic beverage coming from Suspect's person
- [ ] Unsteady gait / unsteady balance
- [ ] Open containers observed at scene
- [ ] Emotions visibly excited
- [✓] Judgment impaired
- [ ] Reason or mental ability affected
- [ ] Soiled clothing
- [✓] Poor driving behavior (describe if not described above):

- [ ] Other observations of impairment:

- [ ] Suspect is currently unconscious or otherwise unable to consent.

Standardized Field Sobriety Tests (Please indicate score, refusal, or inability)

| | Test | Score / Refusal / Inability |
|---|---|---|
| [ ] | Horizontal gaze nystagmus | Refused |
| [ ] | Walk and Turn | Refused |
| [ ] | One leg stand | Refused |
| [ ] | Preliminary breath test results | Refused |
| [ ] | Admission to drinking | 1 beer earlier in day |
| [ ] | Other: | _____ |

Controlled Substances
- [ ] Controlled substances found _____

- [ ] Drug paraphernalia found _____

- [ ] Reasonable grounds to believe the Suspect is under the influence of a controlled substance or drug based on the following observations:

Below that section, there was also a group of boxes to check under the heading "controlled substances" that allowed disclosure of controlled substances or drug paraphernalia found. The final box referenced "Reasonable grounds to believe the Suspect is under the influence of a controlled substance or drug based on the following observations," followed by space for a narrative. While Deputy Syverson marked behavioral indicators for impairment that applied to Wenzel at the top of the form, he did not write a narrative or check any of the boxes in the controlled-substances section.

As a final part of the warrant application, Deputy Syverson attached a written narrative describing the stop. That narrative read:

> Wenzel failed to yield to my police vehicle when I had emergency lights activated as I was attempting to turn around on the highway. Wenzel was the lone occupant and driver of the vehicle. Wenzel had bloodshot and glassy eyes and slurred speech while I was speaking to him. I had the suspect step out of the vehicle and sit with me in my patrol car where I could smell an odor of alcoholic beverages coming from his person. I requested Wenzel perform the Standardized Field Sobriety Tests but he refused. I asked him if he would take a preliminary breath test and he refused.

With this written documentation before it, the issuing court granted the search warrant to take a blood sample to determine if Wenzel violated section 321J.2(1) by operating while under the influence of alcoholic beverages, controlled substances, or drugs. Meanwhile, Wenzel was arrested and charged with OWI, second offense. Initially, the Iowa Division of Criminal Investigation (DCI) only tested for BAC, which came back below .04. *See* Iowa Code § 321J.2(1)(b) (setting the legal limit as .08). A month later, DCI ran a second test covering controlled substances—this test came back positive for amphetamine and methamphetamine.

Wenzel moved to suppress the test for controlled substances. At the suppression hearing, Wenzel conceded the stop of his car and the search warrant were all above board. But, he argued, because the warrant was premised only on reasonable suspicion that he was under the influence of alcohol, not controlled substances, the second blood test was outside the scope of the search warrant and violated both the Fourth Amendment of the Federal Constitution and article I, section 8 of the Iowa Constitution. Conceding he was not trained as a drug recognition expert,[2] Deputy Syverson testified the basis of the application was premised on the suspicion Wenzel had been drinking alcohol as those were the overt signs observed. But he explained that asking for both tests is common practice because of the difficulty with knowing if there is any other type of substance causing an impairment in combination with alcohol use.

The district court ultimately denied the suppression motion. After reviewing the application and the warrant, as well as hearing testimony from the deputy, the district court found that probable cause existed because Deputy Syverson saw Wenzel commit a traffic violation combined with observations of Wenzel's condition and considering his admission to drinking a beer earlier. The court noted "[a]ll of these factors established probable cause for the issuance of the warrant." Yet, the district court determined that "the application for the warrant is devoid of any basis [Wenzel] was operating a motor vehicle while impaired by something other than alcohol." Going further, the court said:

---

[2] Deputy Syverson testified he was employed as a police officer for about five and a half years in South Dakota and after his move, had served as a deputy in Iowa for two and a half years.

> Deputy Syverson did not include any facts to support that conclusion within the narrative contained in the application, nor did he check any of the items with respect to purported reasonable grounds to believe [Wenzel] was under the influence of a controlled substance or drug. Additionally, the application is devoid of any information upon which to base a conclusion that Deputy Syverson is qualified to determine whether a person is operating a motor vehicle while impaired by drugs or controlled substances.

Still, the district court concluded Wenzel had no expectation of privacy in the sample once the blood was drawn, finding the subsequent testing was not a separate or distinct event under the Fourth Amendment. Thus, in the court's view, the drawing of Wenzel's blood was the constitutionally significant event, and the subsequent testing was not a violation of Wenzel's privacy rights nor an unreasonable search.

Following a trial on the minutes, Wenzel was found guilty. Wenzel now appeals, arguing the district court erred in denying his suppression motion.

## II. Analysis.

As framed by him, Wenzel's claims come under the Fourth Amendment[3] of the Federal Constitution and article I, section 8 of the Iowa Constitution. They each function "to protect personal privacy and dignity against unwarranted intrusion by the State." *Schmerber v. California*, 384 U.S. 757, 767 (1966); *accord State v.*

---

[3] The Fourth Amendment of the Federal Constitution states:
> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The language of article I, section 8 of the Iowa Constitution is nearly identical, though even the minor differences have been well debated. *See State v. Gaskins*, 866 N.W.2d 1, 6 (Iowa 2015) (discussing a semicolon present in the Iowa Constitution not present in the Fourth Amendment).

*King*, 867 N.W.2d 106, 110–11 (Iowa 2015) (noting the privacy interests protected by article I, section 8). Both protect against unreasonable searches and seizures and require that a search warrant be based on probable cause. *State v. Moriarty*, 566 N.W.2d 866, 868 (Iowa 1997). A warrantless search is presumed unreasonable, and when a defendant challenges a warrantless search, the State bears the burden of proving the search falls into an exception such as consent or exigent circumstances. *Id.*

Wenzel argues that the second test conducted on his blood was a warrantless, unreasonable search that violated both his Fourth Amendment and article I, section 8 constitutional rights. Because we are reviewing a motion to suppress premised on the violation of a constitutional right, we employ de novo review. *See State v. Green*, 896 N.W.2d 770, 775 (Iowa 2017) ("We look to the entire record and 'make "an independent evaluation of the totality of the circumstances."'" (citations omitted)). "On factual matters, we give deference to the trial court, but we are not bound by its findings." *Id.*

*A. The Second Blood Test as a Separate Search.*

As a preliminary step, we start with Wenzel's argument that testing his blood is a search that is distinct from the blood draw (which he concedes was properly completed pursuant to the warrant). "[A] Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33 (2001); *see also Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring) ("My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective)

expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'"). The Supreme Court has already determined that blood draws and the subsequent chemical testing are a search. *See Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 616 (1989) ("We have long recognized that a 'compelled intrusio[n] into the body for blood to be analyzed for alcohol content' must be deemed a Fourth Amendment search." (alteration in original) (quoting *Schmerber*, 384 U.S. at 767–68); *see also id.* at 618 ("[T]he collection and subsequent analysis of the requisite biological samples must be deemed Fourth Amendment searches.").

Still, Wenzel cannot point to an Iowa case that analyzes the initial draw and the subsequent test as two *distinct* constitutional events. In a published case decided by a panel of our court, we answered this question, with some qualification, stating "though the issue has not been decided in Iowa, we note that other courts have held that a defendant loses a privacy expectation in blood after its lawful removal from the body, and therefore, any testing of that blood does not violate the constitutional protections from unreasonable searches and seizures." *State v. Frescoln*, 911 N.W.2d 450, 456 (Iowa Ct. App. 2017) (listing cases in various jurisdictions and other authority arriving at this conclusion), *further review denied* (Jan. 31, 2018); *see also Jacobson v. State*, 603 S.W.3d 485, 490 (Tex. App. 2020) (finding the defendant lost his expectation of privacy in blood seized to investigate his intoxication while driving, so a second warrant was not needed for subsequent testing, and listing other jurisdictions[4] that found the same).

---

[4] *State v. Hauge*, 79 P.3d 131, 144 (Haw. 2003); *State v. Fawcett*, 877 N.W.2d 555, 561 (Minn. Ct. App. 2016) *aff'd*, 884 N.W.2d 380 (Minn. 2016); *State v.*

Without any Iowa authority to back him up, Wenzel points to language found in *Skinner*, which states, "The ensuing chemical analysis of the sample to obtain physiological data is a further invasion of the tested employee's privacy interests." 489 U.S. at 616. But while the blood draw and the subsequent testing together invade the person's body and privacy, these two pieces—the draw and the test—work in tandem. *See Frescoln*, 911 N.W.2d at 456 (determining that a warrant for a blood draw under section 321J.2 "implie[d] the blood sample would be subjected to chemical testing"); *Schmerber*, 384 U.S. at 770 (allowing a warrantless blood test because the specific facts created exigent circumstances); *see also United States v. Snyder*, 852 F.2d 471, 473 (9th Cir. 1988) ("[The defendant] points out, however, that the exigency justifying extraction of blood is eliminated once the blood is removed from the suspect's body, because any traces of alcohol in the extracted blood will be preserved indefinitely. . . . Removal of blood from a defendant's blood stream eliminates immediately the danger that evidence of blood-alcohol content will be lost. Thus, if [the defendant's] argument were correct, the results of the blood test in *Schmerber* would have been excluded because no exigent circumstances remained by the time the test was actually conducted."). But there are fissures in Wenzel's reliance on *Skinner* as outlined in *State v. Randall*.

> Every . . . search, of course, must have a constitutional justification. But as . . . *Skinner* . . . demonstrate[s], the Court's analytical approach proceeds with the understanding there is only one search, even though the government is both: (1) obtaining a biological

_____

*Swartz*, 517 S.W.3d 40, 48–50 (Mo. Ct. App. 2017); *People v. King*, 663 N.Y.S.2d 610, 614 (N.Y. App. Div. 1997); *State v. Price*, 270 P.3d 527, 529 (Utah 2012); *State v. Martines*, 355 P.3d 1111, 1116 (Wash. 2015); *State v. Sanders*, Nos. 93-2284-CR, 93-2286-CR, 1994 WL 481723, at *5 (Wis. Ct. App. Sept. 8, 1994).

> specimen; and (2) testing the specimen for the presence of alcohol. Thus, the *Skinner* Court referred to a blood draw and test as involving a single search: "We have long recognized that a 'compelled intrusio[n] into the body for blood to be analyzed for alcohol content' must be deemed a Fourth Amendment search." Although the Court recognized in this sentence both the acquisition of the sample and the subsequent analysis, the entirety of the Court's reasoning depended on there having been just one search. If the biological specimen testing regimen in *Skinner* involved an invasion of two distinct privacy interests, the Court would have been duty-bound to assess the constitutional fidelity of each search separately. It did not. Instead, it focused exclusively on the acquisition of the sample to be tested. After the Court satisfied itself that the government had a constitutionally-sufficient basis for obtaining the biological specimens, it declared the testing regime sound.

930 N.W.2d 223, 230 (Wis. 2019) (fifth alteration in original) (internal citation omitted).

Still, even in *State v. Fawcett*, which the district court here cited as supporting the premise that an individual loses their right to privacy in their blood sample after it is drawn, the court recognized that the tests would need to abide by reasonableness standards. 877 N.W.2d at 561 ("Although such circumstances are not before us, we note that *Schmerber* dictates that a standard of reasonableness controls and that an unnecessary invasion of privacy interests would most certainly raise concerns of reasonableness. . . . If the state lawfully obtains a blood sample for the purpose of chemical analysis, then a chemical analysis of the sample that does not offend standards of reasonableness is not a separate search requiring a warrant." (internal citations omitted)); *see also Schmerber*, 384 U.S. at 768 (analyzing if a blood draw and test "respected relevant Fourth Amendment standards of reasonableness"). Even here, while arguing the blood draw and test are not distinct constitutional events, the State concedes that the blood tests would still be subject to search and seizure requirements of reasonableness.

Regardless of if we agree with Wenzel that the second blood test was a distinct and separate constitutional event involving his reasonable expectation of privacy and requiring a separate probable-cause review, our analysis of the warrant process here, as explained below, convinces us it was constitutionally reasonable for the warrant to authorize a search for controlled substances, in addition to alcohol, and the testing at issue in this appeal was within that scope. *See Good v. Iowa Dep't of Hum. Servs.*, 924 N.W.2d 853, 856 (Iowa 2019) (employing constitutional avoidance by choosing not to answer the constitutional question when another could determine the outcome).

*B. The Scope of the Warrant and the Question of Probable Cause and Reasonableness.*

Wenzel starts by acknowledging a valid warrant was granted, but he argues it (1) did not allow for a test for controlled substances or (2) even if it did allow for the test for controlled substances, it lacked probable cause. To counter, the State first argues that the warrant authorized the drug test and, beyond that, the warrant application established probable cause of drugged driving so that a test for controlled substances was reasonable.

The Fourth Amendment does not protect against all searches, but against unreasonable ones. *Carroll v. United States*, 267 U.S. 132, 146 (1925). A search without a warrant is per se unreasonable unless it fits into one of "a few specifically established and well-delineated exceptions." *Katz*, 389 U.S. at 357.[5] Looking at the actual warrant here, it allowed the officers to obtain "[a] blood, urine, and/or

---

[5] The State does not argue an exception applies in this case.

breath specimen from [Wenzel]" because "[o]fficers have probable cause to believe that a traffic violation under Iowa Code § 321J.2 has occurred and the specimen(s) sought are/is relevant to a criminal investigation into a violation of Iowa Code § 321J.2." Section 321J.2 criminalizes operating while intoxicated by either alcohol, controlled substances, drugs, or some combination thereof. On its face then, the warrant allowed for the chemical analyses for alcohol, controlled substances, and drugs.

Our analysis does not end there, however—Wenzel also argues the warrant was not supported by probable cause specifically for controlled substances. "[A]s a reviewing court, we do not independently determine probable cause and instead 'merely decide whether the issuing judge had a substantial basis for concluding probable cause existed.'" *State v. McNeal*, 867 N.W.2d 91, 100 (Iowa 2015) (citation omitted). An "affidavit of probable cause is interpreted in a common sense, rather than a hypertechnical, manner." *State v. Gogg*, 561 N.W.2d 360, 364 (Iowa 1997). There is probable cause to issue a search warrant when "a person of reasonable prudence would believe a crime was committed on the premises to be searched or evidence of a crime could be located there." *Id.* at 363 (citation omitted). "Probable cause to search requires a probability determination that '(1) the items sought are connected to criminal activity and (2) the items sought will be found in the place to be searched.'" *Id.* (citation omitted). "[W]e draw all reasonable inferences to support the judge's finding of probable cause and give great deference to the judge's finding," and "[c]lose cases are decided in favor of upholding the validity of the warrant." *McNeal*, 867 N.W.2d at 100 (first alteration in original) (citations omitted); *cf. Illinois v. Gates*, 462 U.S. 213, 236 (1983) ("'A

grudging or negative attitude by reviewing courts toward warrants' is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant." (internal citation omitted)). In this analysis, we look only to "that information, reduced to writing, which was actually presented to the [judge] at the time the application for warrant was made." *McNeal*, 867 N.W.2d at 100 (alteration in original) (citation omitted).

Our preference is to uphold warrants and construe them in a common-sense manner so that we resolve doubtful cases in favor of their validity. *See State v. Angel*, 893 N.W.2d 904, 911 (Iowa 2017). So, we examine the application here with that lens. While Wenzel draws our focus to the "Controlled Substances" section of the warrant application, which Deputy Syverson left blank, we believe common sense requires we examine all sections of the application. The warrant paperwork is submitted in several parts. First, Deputy Syverson signed an application for search warrant confirming "[o]fficers have probable cause to believe that a traffic violation under Iowa Code § 321J.2 has occurred and the specimen(s) sought are/is relevant to a criminal investigation into a violation of Iowa Code § 321J.2." *See Frescoln*, 911 N.W.2d at 456 (addressing a warrant with the exact same language and applying a "common sense" reading of the warrant). The application also noted the "facts establishing the grounds for issuance of a search warrant are as set forth in the attachments made a part of this application." The first attachment—"A-1 OBSERVATIONS ON SCENE"—contained standard language:

> Based on my training, education, experience, and discussions with other members of law enforcement, I know the collection of a specimen for forensic testing will aid my investigation and determine

what role the use of alcoholic beverages, controlled substances, or drugs played in this traffic offense. Based on my training, education, experience, and discussions with other members of law enforcement I know that persons who have prior convictions for operating while Intoxicated or who have been investigated for operating while intoxicated on previous occasions are more likely to refuse chemical testing.

Based on the following information, I have probable cause to believe suspect has violated Iowa Code § 321J.2.

Thus, as an issuing judge, one could read the application as requesting a blood draw to investigate the cause of the impaired driving supported by observations of bloodshot and watery eyes, slurred speech, impaired judgment, and poor driving. *See State v. McIver*, 858 N.W.2d 699, 703 (Iowa 2015) (noting aberrant driving can raise a suspicion of impairment). A judge could also consider that the objective observations checked by the deputy might support intoxication by consumption of a controlled substance, drug, alcohol, or a combination of the three. Partnered with those objective observations, an issuing judge would be aware of "the reality that a peace officer may only begin to suspect drugs other than alcohol may be involved to explain impaired driver conduct after a test geared to detect the presence of alcohol fails to detect any alcohol or enough alcohol to explain the impaired conduct." *See id.* at 707. Our supreme court recognized the limitations of detection involving impairment by drugs by noting these hurdles:

> Unfortunately, there is no procedure comparable to the Standard Field Sobriety Test that a police officer can administer on a roadside to determine if a driver is under the influence of drugs. For example, marijuana diminishes a person's temporal and spatial judgment, but the Standard Field Sobriety Test does not measure those effects. Police officers also rely on nystagmus to determine if a person is under the influence of alcohol, but drugs that dilate or constrict the pupils do not also cause nystagmus.

*State v. Childs*, 898 N.W.2d 177, 184 (Iowa 2017) (quoting Paul J. Larkin Jr.,

*Medical or Recreational Marijuana and Drugged Driving*, 52 Am. Crim. L. Rev. 453,

483 (2015)).  While objective observations, such as slurred speech, can be indicia

of intoxication by alcohol or by drugs, the more difficult task of identifying the

specific level of drug use to show impairment should not serve as an impediment

to enforcement.  That is why the legislature's harsh treatment of driving while

drugged "is ameliorated by the fact that the motorist would be asked to submit to

chemical testing only after the officer performed a lawful traffic stop and had

reasonable grounds to believe the driver was impaired." *Id.* at 185.  This kind of

tension is exactly the situation we face here.[6]  With impairment established by

objective signs, it is reasonable to allow for blood testing to determine the source

without having to *know* the specific source from the get-go.  Unlike the district court,

we conclude the issuing judge had a substantial basis for concluding probable

cause existed to obtain Wenzel's blood sample to test for controlled substances

and drugs as well as alcohol.

---

[6] We recognize there are law enforcement officers trained specifically in drug detection, but not all are.  Still, as here, officers trained to spot impaired driving should have the tools available to determine the cause.  The importance of removing impaired drivers from the road supports the reasonableness of testing for substances that might have caused that impairment.  After all,

> [j]ust as a peace officer must possess reasonable grounds to believe a driver is in violation of the statute, drivers possess common knowledge that the consumption of alcoholic beverages and controlled substances alter thinking and impair physical actions. Persons of ordinary intelligence know that their conduct may be in violation of the statute if they drive a motor vehicle after intoxicating drugs are consumed.

*State v. Newton*, 929 N.W.2d 250, 257 (Iowa 2019).

As further support for his probable-cause argument, Wenzel points to the suppression court's conclusion that Deputy Syverson gave no factual support in the application that Wenzel was impaired by drugs or controlled substances. At that hearing, Deputy Syverson was less than clear about his suspicions over the cause of Wenzel's impairment. When questioned, he testified:

> Q. Now when you sent the specimen to the Iowa DCI, why did you check for a drug screen in addition to an alcohol or ethanol screen? A. Because when we take a sample, we test everything that we can on that sample to get a true and accurate representation of what's going on.
> Q. And I understand that. But you did so without any facts or reasonable basis in the suspicion that he was under the influence of a controlled substance; correct? A. Well, impairment can be caused by both alcohol and other drugs. Based on not having any field sobriety tests or a breath test or anything, I believed there was impairment. And the main cause I believed was alcohol at the time, but I had no way of ruling out any other kind of impairment.
> Q. Come on now, though. In your application to the Court you didn't mention anything about a suspicion of drug impairment, did you? A. I did not.
> Q. And there's specific boxes there for that; correct? A. Yes, there is.
> Q. And so you sent that blood sample to the lab requiring a drug screen; correct? A. Correct.
> Q. But you didn't mention a single word of any suspicion of drugs in your application to [the issuing judge], did you? A. I did not.

Yet, the deputy also answered "Yes, it can" when asked if some of the signs of impairment could also be caused by use of a controlled substance. While Deputy Syverson's testimony at the suppression hearing was that he had no suspicion Wenzel was under the influence of controlled substances to voice to the issuing judge, this is not reflected in the pages of the written application. *See State v. Thomas*, 540 N.W.2d 658, 662 (Iowa 1995) (explaining that in reviewing the outcome of a suppression hearing concerning the sufficiency of a warrant, the reviewing "court may not consider any other relevant information present in the

record which was not presented to the neutral magistrate issuing the warrant"). Important here, while the suppression hearing judge did not account for this testimony describing the difficulty to establish the specific cause of the impairment in the field, it cannot be disputed that the question of impairment was established for probable cause purposes. The lack of additional information in the controlled substances section of Attachment A-2 does not undermine the full application's goal of seeking intoxicants to determine the cause of impairment.

True, Deputy Syverson's preliminary judgment was that alcohol created Wenzel's intoxication, but "[p]robable cause is not the same standard as beyond a reasonable doubt. Probable cause may exist even if the officer's perception of the traffic violation was inaccurate." *State v. Tyler*, 830 N.W.2d 288, 293 (Iowa 2013) (viewing the stop from the standpoint of an objectively reasonable officer). Here, Deputy Syverson had an objective reason to believe Wenzel was driving while impaired and that some measure of alcohol might be the cause or part of the cause. A full review of the application describes the intoxicants sought as alcohol, controlled substances, or drugs; based on the four corners of the warrant application, a person of reasonable prudence would believe Wenzel was driving while intoxicated and the intoxicants would probably be found in Wenzel's blood. Deputy Syverson was not trained as an expert in drug recognition, but he was trained to recognize physical signs of a driver's impairment, which Wenzel exhibited.

So, returning to our common-sense analysis, we consider the totality of the circumstances that are presented in the warrant application and "ask whether the common-sense inferences a person may draw from them would lead 'a person of

reasonable prudence [to] believe . . .evidence of a crime could be located' in the place to be searched." *McNeal*, 867 N.W.2d at 102 (alterations in original) (citation omitted). And again, "we draw all reasonable inferences to support a court's finding of probable cause." *State v. Davis,* 679 N.W.2d 651, 656 (Iowa 2004). We do not make an independent determination of probable cause but look to the information, reduced to writing, available to the warrant judge to see if there was a substantial basis for finding the existence of probable cause. *Id.* The issuing judge would have considered that Wenzel's traffic offense involved impaired judgment by failing to yield to an emergency vehicle, that Wenzel had bloodshot and glassy eyes and slurred speech, and that Wenzel rejected all field sobriety tests. With an admission to drinking only one beer, it was reasonable for an issuing judge to support further investigation into the cause of Wenzel's impairment beyond alcohol consumption because impairment might be caused by a combination of alcohol and other substances. As such, the warrant ordered future testing of the blood that would aid the investigation and "determine what role the use of alcoholic beverages, controlled substances, or drugs played in the traffic offense." This information contained in the affidavit was sufficient to find probable cause to test Wenzel's blood to determine what role the substances listed might play in committing the traffic offense.

In sum, we find there was probable cause to do a blood draw and it was reasonable to test the blood for alcohol, controlled substances, and drugs. Finally, we note that Wenzel takes issue with the second test as being overbroad because the lab ran screens on fifteen different panels. But the warrant did not limit the types of intoxicants that could be tested—we find the use of those screens was to

establish the reason behind the observed impairment of Wenzel and not for some other crime-related fishing expedition. And, in all fairness, in some cases the testing profile could actually exonerate a driver. *See State v. Myers*, 924 N.W.2d 823, 831 (Iowa 2019) ("Impaired conduct can be consistent with the presence of a controlled substance, but it can also result from a medical condition or other causes unrelated to the consumption of a controlled substance.").

*C. Article I, Section 8.*

As a final argument, Wenzel attempts to utilize our supreme court's prerogative to "jealously guard [the] right to construe a provision of our state constitution differently than its federal counterpart, though the two provisions may contain nearly identical language and have the same general scope, import, and purpose." *State v. Brown*, 930 N.W.2d 840, 847 (Iowa 2019) (citation omitted). "Even where a party has not advanced a different standard for interpreting a state constitutional provision, we may apply the standard more stringently than federal case law." *State v. Pals*, 805 N.W.2d 767, 771–72 (Iowa 2011). Wenzel asks that, if we do not believe the search violates his rights under the Fourth Amendment, we should find it violates his rights under article I, section 8 of the Iowa Constitution.

But, even earlier this year, our supreme court has continued to use the same analysis for the review of search warrants as our federal counterparts. *See State v. Bracy*, 971 N.W.2d 563, 568–70 (Iowa 2022) (refusing to dissect a "warrant, examining it bit-by-bit" and throw out parts that do not establish probable cause on their own); *but see id.* at 574 (Appel, J., dissenting) ("Bracy does not, however, suggest that the substantive standards to be applied in this case under the Iowa Constitution are different from those articulated by the United States

Supreme Court under the Fourth Amendment. As a result, under our precedent, we apply the prevailing federal standards, but we reserve the right to apply those standards in a fashion that differs from federal caselaw for the purposes of this case." (footnote omitted)).[7] Because our supreme court has remained consistent with federal jurisprudence in reviewing warrants, we will not deviate from the course. We hold the warranted blood draw and test did not violate Wenzel's article I, section 8 constitutional rights.

**III. Conclusion.**

We affirm Wenzel's conviction and sentence on the basis that the test of his blood for controlled substances and drugs was both allowed under the warrant and supported by probable cause.

**AFFIRMED.**

---

[7] In addition to *Bracy*, our supreme court decided *State v. Wright*, 961 N.W.2d 396 (Iowa 2021), which involved a warrantless search of the contents of Wright's trash. In *Wright*, a plurality of the court outlined a process for determining whether a search had occurred—rather than using an individual's privacy expectation to determine whether State action was a search, that privacy expectation impacts only if the search is reasonable. *Wright*, 961 N.W.2d at 414 (plurality opinion). While Wenzel argues *Wright* should change the result here, we disagree because this search was conducted pursuant to a warrant and that the search was reasonable.