OPINION OF THE COURT
Peter M. Leavitt, J.
On March 9 and March 10, 1994, a hearing was held before this court — pursuant to the decision and order of the Hon. John R. LaCava, J.C.C., entered August 30, 1993 — on defendant’s motion to suppress the results of a DNA analysis of a sample of his blood. Detectives Hunt and Zadorosky of the Yonkers Police Department, Mr. Ted Pool of the Westchester County Forensics Science Laboratory and Assistant District Attorney (ADA) Barbara M. Egenhauser of the Office of the District Attorney of Westchester County, testified for the prosecution. Ms. Jametka King, Ms. Emily Lawrence and Mr. Samuel King testified for the defense. The court has also reviewed and considered all of the papers which were previously submitted in support of, and in opposition to, the People’s motion for an order to compel the defendant’s provision of a blood sample and the defendant’s motion to suppress.
The court makes the following findings of fact and conclusions of law:
FINDINGS OF FACT
On August 22, 1991, Detectives Hunt and Zadorosky were dispatched to 42 Paula Avenue, Yonkers, New York, to investigate the reported rape and robbery of one of the residents of *450 the apartment building which is located at said address. The complainant provided the detectives with a description of the perpetrator including his race, height, build, approximate age, clothing, and a distinctive body odor which she described as an "industrial odor”. Upon investigation, the detectives discovered items of clothing, surgical gloves, a knotted pair of white pantyhose and a knife in a common area in or near the basement of the building. Each of these items had been mentioned by the complainant in her description of her assailant.
The defendant, who was then 14 years of age, resided in another apartment in the same building with his father, Samuel King, and his 10-year-old sister, Jametka King. Due to the defendant’s close proximity to the scene of the attack, and since he fit the complainant’s description of the perpetrator— and for other reasons which will be discussed infra, the detectives went to defendant’s apartment to interview him. When Jametka King opened the door in response to their knock, however, the detectives entered the apartment, uninvited.
Once inside the apartment, the detectives began speaking with the defendant and his aunt, Emily Lawrence. Ms. Lawrence was not a resident of the apartment and had no proprietary interest therein; she was merely a guest. Samuel King was not present. The detectives asked for and received Ms. Lawrence’s "consent” to search the apartment, pursuant to which they seized some mothballs from one of the defendant’s dresser drawers. The complainant later identified the odor of the mothballs as the "industrial odor” of her assailant.
The detectives spoke with Samuel King by telephone from Mr. King’s apartment, and during such conversation, obtained his permission to question the defendant. They then advised the defendant of the so-called Miranda warnings. When asked about his actions earlier that day, the defendant said, essentially, that he had been in the apartment all day except for a brief period when he’d taken out the trash. The trash cans were located in the same common area of the building where the detectives had discovered the clothing, gloves, pantyhose and knife which the complainant had associated with her assailant.
The detectives then told the defendant that they were taking him to police headquarters. When he removed his robe to dress for the trip, the detectives observed "fresh lacera *451 tians” on the defendant’s back and asked him how he had received them. The defendant replied that he had fallen off of a wall. Although the detectives were aware that the defendant’s father was en route to police headquarters, photographs of the defendant’s back were taken at headquarters before Mr. King’s arrival.
During the first week of March 1992, two items bearing semen stains were delivered to Mr. Pool’s office for analysis. One of the items had been recovered from the scene of the crime which had occurred at 42 Paula Avenue on August 22, 1991 (hereinafter the August rape). The other item had been recovered from the scene of another, unsolved, rape and robbery which had occurred in the same geographical area on May 22, 1991 (hereinafter the May rape). Upon his initial examination, Mr. Pool determined and advised ADA Egenhauser that there was sufficient material in each stain to conduct a DNA analysis for comparison with a blood sample.
Although the defendant was the principal suspect in the May rape, according to ADA Egenhauser, the People could not have established probable cause for the issuance of an order to compel him to provide a blood sample in connection with said investigation. However, in the belief that probable cause could be established as to the August rape, the People moved for such an order in connection with the investigation thereof.
In addition to the information which has been reviewed herein, ADA Egenhauser’s affirmation in support of the motion related other information which had been gathered to that point in the investigation of the August rape — e.g.: the perpetrator had said things during the attack which required a knowledge of the complainant’s personal background and her recent daily activities in the apartment building, and a neighbor had seen the defendant near the aforementioned trash cans at a time immediately after the perpetrator had fled the complainant’s apartment. No mention was made of the May rape or of the status of the investigation thereof. The People’s motion was granted over the defendant’s opposition and an order to compel the provision of blood samples was issued by Judge LaCava on April 3, 1992 (hereinafter the Blood Order).
The blood samples were obtained on December 29, 1992. ADA Egenhauser directed Mr. Pool to analyze and compare the defendant’s blood against the stains recovered from both *452 the August and May rapes.[1] When an analysis of the stain from the August rape was attempted, it was discovered that the stain did not contain sufficient material for DNA analysis. Analysis of the stain from the May rape, however, revealed a positive match of the DNA characteristics of said stain and the defendant’s blood. The charges contained in the instant indictment all derive from the May rape. No charges have been filed against the defendant in connection with the August rape.
CONCLUSIONS OF LAW
A defendant, or potential defendant, can be compelled to provide a blood sample only by court order issued pursuant to motion upon notice therefor. (CPL 240.40 [2] [v] [5]; People v Moselle, 57 NY2d 97, 110 [1982].) Such an order may issue only if the People are able to establish, "(1) probable cause to believe the suspect has committed the crime, (2) a 'clear indication’ that relevant material evidence will be found, and (3) the method used to secure [the blood sample] is safe and reliable”. (Matter of Abe A., 56 NY2d 288, 291 [1982].)
The defendant herein argues that the information which was contained in the application upon which the Blood Order issued was obtained unlawfully or tainted by the unlawful seizure of other evidence. Thus, any evidence derived from execution of said order — i.e., the results of the DNA analysis— must be suppressed. (See, People v Guins, 165 AD2d 549, 553 [4th Dept 1991].)
Indeed, some of the information averred in support of the People’s application appears to have been infected by one or more constitutional infirmities, which would render it inadmissible at trial and unavailable for consideration on this court’s inquiry into the validity of the Blood Order. However, assuming — without deciding — that such infirmities have been established, the court finds that, "the application contained sufficient lawfully obtained information, untainted by and *453 independent of the illegality to constitute probable cause”. (People v Vonderhyde, 114 AD2d 479, 480 [2d Dept 1985]; see, e.g., People v Harris, 62 NY2d 706 [1984]; People v Bacalocostantis, 121 AD2d 812 [3d Dept 1986]; compare, Matter of William D. v Rohl, 148 AD2d 706 [2d Dept 1989].)
The defendant does not challenge the safety or reliability of the method by which the blood sample was physically taken. Therefore, the first and third of the three prerequisites enunciated in Matter of Abe A. (supra) were met — at least with respect to the investigation of the August rape. The defendant argues, however, that the results of the DNA analysis must, nevertheless, be suppressed because the Blood Order was not issued upon probable cause that he had committed the particular crime — i.e., the May rape — for the investigation of which the sample was actually taken.
This court is unaware of, and the defendant does not cite, any authority which supports the proposition that probable cause must be shown anew for each subsequent use to which a blood sample might be put once it has been lawfully taken.[2] Moreover, the underlying rationale for the probable cause requirement is the constitutional right to be free from an unreasonable seizure of one’s person. (Matter of Abe A., supra, at 295.) Since there was probable cause to issue the Blood Order, the seizure of defendant’s person pursuant thereto was not unreasonable. It is, therefore, irrelevant whether such probable cause related to the May rape or the August rape. Furthermore, there is no concomitant right concerning the disposition of a blood sample, lawfully seized, such as would immunize the donor from the consequences of its use in unrelated police investigations. (Cf., United States v Jakobetz, 955 F2d 786, 802 [2d Cir 1992] [subsequent use of arrest photograph]; People v Dozier, 131 AD2d 587 [2d Dept 1987] [subsequent use of arrest photographs in violation of CPL 160.50); People v Gilbert, 136 AD2d 562 [2d Dept 1988] [fingerprints]; compare, People v Johnson, 88 Misc 2d 749 [Onondaga County Ct 1976] [suspect was in unlawful custody when photographs taken so subsequent use tainted].)
 Contrary to the People’s argument, however, a donor does not lack standing to challenge the subsequent use of his blood sample merely because it was initially seized pursuant *454 to a valid court order. Rather, in the circumstances herein, the "minimal additional intrusion” occasioned by the second DNA analysis did not constitute an unreasonable seizure beyond the initial reasonable seizure of defendant’s person. (Cf., People v Whitaker, 64 NY2d 347, 352 [1985] [use of lawfully arrested suspect as filler in lineup for unrelated investigation]; People v Jackson, 65 NY2d 265, 270, n 4 [1985] [statements elicited from sentenced prisoner in unrelated investigation]; People v Williams, 170 AD2d 552 [2d Dept 1991] [photographs taken while suspect in lawful custody pursuant to unrelated investigation].) Nor would the People’s retention of the blood sample, following the unsuccessful attempt to analyze the stain from the August rape investigation (see, n 1, supra), have constituted a new seizure or affected a property interest of the defendant deserving of due process protection.[3] (See, Matter of DeBellis v Property Clerk of City of N Y., 79 NY2d 49, 58-59 [1992]; Matter of Documents Seized Pursuant to Search Warrant, 124 Misc 2d 897 [Sup Ct, NY County 1984].)
Accordingly, for all of the foregoing reasons the defendant’s motion must be, and is hereby, denied in its entirety.

. Curiously, in their affirmation in opposition to the defendant’s motion to suppress, the People alleged that the report of the analysis of the stain from the May rape was not issued until seven weeks after issuance of the report concerning the August rape. Further, the People implied in said affirmation that the decision to analyze the stain from the May rape was not reached until after the stain from the August rape had proven to be insufficient for analysis. However, despite that these allegations appear to be in direct conflict with the hearing testimony of Mr. Pool and ADA Egenhauser, defense counsel chose not to explore the issue.

. The defendant’s citation of People v Moselle (supra) is unavailing as Moselle is concerned with the lawfulness of the taking of a blood sample rather than its subsequent use in unrelated investigations.

. Indeed, more troubling to the court was the possibility that the People actually were, or should have been, aware that said stain did not contain sufficient material for analysis. In such circumstances there would have been a failure to establish in the application a "clear indication” that seizure of the blood sample would lead to the discovery of "relevant material evidence”, and the Blood Order would have to be controverted for failing to meet the second prerequisite enunciated in Matter of Abe A. (supra). (Cf., Matter of Anonymous v Cacciabaudo, 153 AD2d 856, 858 [2d Dept 1989].) However, defendant was unable to establish either that Mr. Pool’s initial evaluation was erroneous or untruthful, or that the People otherwise acted in bad faith.