People v Chiclana (2025 NY Slip Op 50654(U))

[*1]

People v Chiclana

2025 NY Slip Op 50654(U)

Decided on April 25, 2025

Supreme Court, Erie County

Boller, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on April 25, 2025
Supreme Court, Erie County

The People of the State of New York

against
Bryan Chiclana, Defendant

Indictment No. 70928-25

For the People:
Michael J. Keane, Esq.
District Attorney, Erie County
Rebecca L. Schnirel, A.D.A.
For Defendant:
Florina Altshiler, Esq. & Robert J. Cutting, Esq.

M. William Boller, J.

The defendant is charged with Murder in the First Degree and two counts of Murder in the Second Degree by way of indictment. The People have filed a motion pursuant to CPL §245.40(1)(e) seeking the defendant to submit to the taking of a buccal swab to obtain a DNA sample. The defense has filed a response opposing the People's motion, or in the alternative, granting a protective order prohibiting the defendant's DNA profile from being uploaded into the local DNA databank. The People filed a response opposing the defense request for a protective order. The issue came before the Court for oral argument on April 21, 2025.
The People's initial motion lays out the facts of the incident which included the recovery of numerous pieces of evidence including physical evidence (pipes, hammer, clothing) and presumptive blood stains. The People allege that on March 4, 2025 Buffalo Police responded to a 911 call of a man armed with a knife. Upon arrival at the scene, officers observed the defendant inside the lower apartment of the address in the call. The defendant exited the apartment and the police later found the two residents of that apartment in the basement, deceased with head injuries. The People attached two laboratory reports from the Erie County Central Police Services Lab which indicates there were DNA profiles developed on various pieces of evidence (some already linked to the victim and some indicating there is DNA from an [*2]unknown male). Erie County CPS Lab Report #1, contains the test results for dried red staining, both on numerous pieces of clothing as well as two separate pipes. Various items match the two victims as well as an unknown male. Erie County CPS Lab Report #2 contains the results of testing of a hammer as well as dried red staining on the hammer. The dried red staining matches the known DNA profiles of the victims. The DNA obtained from the hammer handle includes three profiles (including at least one male and the victims are not excluded). In their moving papers, the People cite both CPL §245.40(1)(e) and Matter of Abe A., 56 NY2d 288 in requesting the Court grant the relief they seek.
In opposing the motion, the defense argues that the People's application is legally and factually deficient and further, that granting the request would violate the defendant's right to be free from unreasonable search and seizures. The defendant also argues that if the People's request is granted, the Court should issue a protective order prohibiting the DNA sample of the defendant from being uploaded into the local DNA databank. 
The taking of a buccal swab was originally governed by Matter of Abe A. In the Matter of Abe A, the Court of Appeals held,
"We hold a court order to obtain a blood sample of a suspect may issue provided the People establish (1) probable cause to believe the suspect has committed the crime, (2) a "clear indication" that relevant material evidence will be found, and (3) the method used to secure it is safe and reliable. In addition, the issuing court must weigh the seriousness of the crime, the importance of the evidence to the investigation and the unavailability of less intrusive means of obtaining it, on the one hand, against concern for the suspect's constitutional right to be free from bodily intrusion on the other. Only if this stringent standard is met, as we conclude it was here, may the intrusion be sustained."
The standard outlined in Abe A. was later codified in 2020 under CPL §245.40(1)(e). The statute reads that, "After the filing of an accusatory instrument, and subject to constitutional limitations, the court may, upon motion of the prosecution showing probable cause to believe the defendant has committed the crime, a clear indication that relevant material evidence will be found, and that the method used to secure such evidence is safe and reliable, require a defendant to provide non-testimonial evidence, including to:...(e) Permit the taking of samples of the defendant's blood, hair, and other materials of the defendant's body that involves no unreasonable intrusion thereof."
Both under Abe A., and CPL §245.40(1)(e), the Court must evaluate the three prongs delineated in the statute prior to granting the People's motion. As outlined above, the People must demonstrate probable cause the defendant committed a crime, a clear indication relevant material will be found and that the method to secure the evidence is safe and reliable. If the three prongs are met, the motion should be granted. If any of the three prongs are not met, the motion must be denied. 
The defendant has argued there is a lack of probable cause of the crimes committed. The defendant further argues the "People are engaged in an expedition to create a nexus between the defendant and the crimes." In this case, the defendant has been indicted by a grand jury. Under CPL § 190.65 (1) "Subject to the rules prescribing the kinds of offenses which may be charged in an indictment, a grand jury may indict a person for an offense when (a) the evidence before it is [*3]legally sufficient to establish that such person committed such offense provided... (b) competent and admissible evidence before it provides reasonable cause to believe that such person committed such offense." This issue is addressed in People v J.C.,
"Furthermore, defendant has been indicted by a grand jury—which already found that there was probable cause to believe that he committed the crimes with which he is charged (see People v London, 124 AD2d 254, 256 [3d Dept 1986], lv denied 68 NY2d 1001 [1986]; People v Fisher, 71 Misc 3d 1051, 1056 [Sup Ct, Bronx County 2021]). The grand jury's indictment of defendant provides the requisite probable cause and statutory authority for a DNA swab; thus, there is a reasonable basis to have defendant submit to the taking of buccal swab samples of his saliva and mouth." People v J.C., 82 Misc 3d 1214(A). 
See also, People v Lora, 72 Misc 3d 1223(A), "Here, the defendant has already been indicted, therefore probable cause has been established."
As it relates to the first prong, the People have met their burden. The evidence was presented to a Grand Jury which returned an indictment charging the defendant with Murder in the First Degree and two counts of Murder in the Second Degree. The fact an indictment has been returned satisfies the People's burden that they demonstrate probable cause the defendant committed a crime. However, in addition to the indictment, the People have outlined a number of facts in their motion papers and provided CPS Lab reports and photographic evidence linking the defendant to the scene and evidence recovered from the scene. 
The second prong requires the People to demonstrate that there is a clear indication relevant material will be found. The defense argues, there is no clear indication before the Court that defendant's DNA will have any connection to the alleged weapons in question. The defense further argues, "The purpose of non-testimonial evidence sought by the People should be to supplement evidence that they already possess that conclusively connects the suspect to the crime." (Citing People v Washington, 33 Misc 3d 640). The actual language in Washington is, "The purpose of the non-testimonial evidence sought by the People should be to supplement evidence that they already possess and would conclusively connect the suspect to the crime." The defense further argues, "Instead the People appear to be using the non-testimonial evidence in this case as the starting point in their investigation." There is no statutory requirement mandating the People use evidence in a specific manner. The question before the Court is whether the People have their burden (the three prongs listed above) to lawfully obtain the evidence. How it is used by the People is up to the People (and governed by the rules of evidence). Neither Matter of Abe A or CPL §245.40(1)(e) contain any requirements the People demonstrate the evidence sought will be used in a specific manner. The threshold question is whether they meet the three prongs to obtain the requested evidence.
Generally, courts have denied applications for buccal swabs prior to the completion of the initial DNA testing. After a law enforcement officer recovers and preserves evidence for the purpose of forensic testing, that evidence is submitted to the appropriate laboratory, in this case, the Erie County CPS Lab for testing. While each case is unique and at times, "known" buccal swabs which were voluntarily obtained or abandoned are submitted with the crime scene evidence, many times the initial testing is from evidence recovered at the scene. This includes [*4]physical evidence such as weapons or clothing as well as swabs obtained at a crime scene. Upon receipt, the laboratory will engage in initial testing which includes swabbing physical evidence and further testing the swabs to determine if there is DNA present. If DNA is present, the laboratory may be able to develop a profile or profiles from the evidence. Many times this is an "unknown" profile, that is, a DNA profile that has not yet been attributed to a specific person. It is at this point the laboratory produces an initial report of their testing. That is the situation in this case. The People have provided two reports from the Erie County CPS lab outlining the initial testing, and specifically, that DNA was found on various items and DNA profiles were developed. 
DNA testing, when reviewed in a vacuum, tends to yield relevant material. "Since the first use of forensic DNA analysis to catch a rapist and murderer in England in 1986...law enforcement, the defense bar, and the courts have acknowledged DNA testing's 'unparalleled ability both to exonerate the wrongly convicted and to identify the guilty. It has potential to significantly improve both the criminal justice system and police investigative practices." Maryland v King, 569 U.S.435.
At this point, having reports indicating initial testing was completed and DNA profiles were developed on various pieces of evidence, the People have met their burden demonstrating that there is a clear indication relevant material will be found. Therefore, the People have met their burden under the second prong.
Finally, it is well established that the taking of a buccal swab is a safe and reliable method to obtain a DNA sample from an individual. Essentially, it is nothing more than a giant Q-tip rubbed in the mouth on the inside of a cheek. The taking of a DNA sample through a buccal swab has long been considered both safe and reliable, satisfying the third prong. See People v Blank, 61 Misc 3d 542 referring to Matter of Abe A., 56 NY2d 288, "(T)he method of swabbing the inside of the defendant's mouth has been deemed to be safe and reliable." Also, People v White, 60 Misc 3d 304, "There is no doubt that a routine cheek swab is a 'safe and reliable' method of obtaining the defendant's DNA sample." Also,
"Indeed, the Supreme Court of the United States has characterized the buccal swabbing procedure as a "brief and ... minimal intrusion" that is "quick and painless," and expressed that a reasonable expectation of an individual's privacy is not offended by the "minor intrusion of a brief swab of [the] cheeks" (Maryland v King, 569 US 435, 463, 465 [2013]). And giving more credence to this view, the Court of Appeals has too recognized as much, observing that a buccal swab is "now a simple and common method" and "is undeniably safe, consists of a minimal intrusion[,] and involves no discomfort" (People v Goldman, 35 NY3d 582, 594 [2020]). In fact, "[n]o less-intrusive alternative means for obtaining such evidence has been approved" yet (People v Fortuna, 78 Misc 3d at 386)." Poeple v J.C., 82 Misc 3d 1214(A) (2024). 
The defense has not presented any argument that there is a unique factor in this case which would lead to this well established method of DNA collection being either unsafe or unreliable.
Therefore, as the People have met their burden under all three prongs of CPL §245.40(1)(e), the Court grants the People's motion and orders the defendant to submit to the taking of a buccal swab.
The Court now turns its attention to the defense's request for a protective order. The defense has argued that if the Court does grant the People's motion granting the taking of a buccal swab, the protective order "would confine the results of the DNA profile of the Defendant to its comparison to the DNA evidence collected in this case and preventing any sample ordered by this Court from being entered into the local OCME DNA databank." To clarify, the defense is seeking to prevent the defendant's DNA sample from being entered into Erie County CPS Lab's local DNA databank. The "OCME DNA databank" refers to the Office of the Chief Medial Examiner which is the crime lab located in the New York City area. The defense outlines their arguments requesting a protective order in paragraphs 19 through 33 of their opposing affidavit. The defense arguments include that allowing the sample into the local DNA databank would violate the defendant's constitutional rights, Executive Law 995 only allows for the storage of convicted offenders and this would lead to fishing expeditions by the People. Ultimately, the defense argues that, "there's no law requiring an innocent man to forgo all constitutional rights upon an arrest only."
The People have opposed the defense request for a protective order. They argue that this Court has already addressed this issue in other cases and the proper remedy already exists under Executive Law 995(c). 
As the People correctly note, the issue of a protective order prohibiting a defendant's DNA sample from being uploaded into the local DNA databank has previously been addressed by this Court. This Court took up this issue in People v Rogers, 77 Misc 3d 182 (2022). The issue concerns a DNA sample that has been lawfully obtained, as in this case, through an order to show cause, and whether it is permissible for that DNA sample to be uploaded in the local DNA databank. By way of review:
The Local DNA Index System (LDIS) is part of the three-tier Combined DNA Index System (CODIS). The three tiers are LDIS on the local level, the State DNA Index System (SDIS) on the state level and finally the National DNA Index System (NDIS). This system was first established in 1994 when Congress passed the DNA Identification Act which authorized the FBI to establish a national DNA database. The database launched in 1998 and linked all fifty states through the database. 
SDIS was created during this same time period. "In 1994, the Legislature established a statewide DNA databank along with a comprehensive set of standards and protocols for accrediting forensic laboratories throughout New York State. Enacted as Article 49—B of the Executive Law, the legislation starts with the creation of the New York State Commission on Forensic Science, a representative body whose mission is to promulgate rules for "any laboratory operated by the state or unit of local government" (Exec. Law § 995—1) "that performs forensic testing on crime scenes or materials derived from the human body for use as evidence in a criminal proceeding ..." Exec. Law § 995—2." People v K.M., 54 Misc 3d 825. The Forensic Science Commission is composed of laboratory directors, prosecutors, defense attorneys, state Department of Health officials and retired judges. The Commission is tasked with developing minimum standards and accreditation for New York State forensic laboratories. 
The Erie County CPS Lab has maintained a local DNA databank for well over two decades at this point, as LDIS was created back in 2000. As an accredited forensic lab, the Erie County CPS Lab is under the oversight of multiple accrediting agencies. The FBI, the New York [*5]State Division of Criminal Justice Services Office of Forensic Services and American Society of Crime Lab Directors/Laboratory Accreditation Board (ASCLD/LAB) are aware the CPS maintains suspect DNA profiles in LDIS.
All three tiers of CODIS have varying regulations both as to what samples are eligible for upload as well as who has access to the samples. SDIS, for example, contains convicted offender profiles, certain unknown profiles from crime scenes as well as missing persons and unidentified human remains. In addition to those categories, NDIS also contains arrestee profiles from states that permit the taking of DNA samples upon arrest (New York does not allow the taking of a DNA sample upon arrest as they do a mug shot or fingerprints). LDIS contains forensic DNA profiles derived from crime scene evidence, DNA profiles of individuals deemed to be a suspect by law enforcement- voluntary, court ordered and abandoned samples, DNA profiles from missing persons, unidentified human remains, and family members of missing persons. There is also a specimen category that contains DNA profiles of CPS personnel who have provided a DNA sample as well as anonymized DNA profiles of law enforcement personnel who have provided a DNA sample, as well as vendors and visitors of the CPS laboratory.
While one of the primary purposed of CODIS and the various tiers of DNA databases is their use as investigative tools in criminal investigations, this is far from their only application. These DNA databanks are vitally important in the investigation of missing persons and unidentified human remains. Additionally, with regards to the criminal investigation aspect of the DNA databanks, not only do they serve to link suspects with unsolved crimes, but they play an equally important role in the exoneration of innocent individuals. 
The Erie County CPS Lab has strict controls and procedures governing the use of LDIS. All DNA profiles in LDIS are stored under a unique, anonymized specimen number. No personal identifying information relating to any profile, including a suspect's profile, is maintained in LDIS. LDIS is accessible only to CPS personnel who have been pre-qualified by the FBI. To be an FBI-approved CODIS User with access to LDIS the employee must have submitted a fingerprint card to the FBI and undergone a background check by the FBI. In addition, those CODIS Users who are DNA analysts must also meet national educational standards. The FBI additionally requires annual training to maintain CODIS eligibility. In accordance with FBI requirements, the CODIS computer network, which includes LDIS, is maintained separately from the CPS's City network and is only accessible at designated terminals within the CPS Lab. Access to the CODIS computer network is password protected. Access to CODIS is deactivated when one leaves the employ of the CPS including temporary extended leaves of absence beyond one year, such as a military activation or a maternity leave. No other City, State or Federal agencies have access to LDIS. These safeguards ensure the DNA profile is secure and protects the privacy interests of individuals whose samples are contained therein.
As this Court articulated in its decision in Rogers, a key issue is the use of evidence that has been lawfully obtained. This issue was addressed in People v King, 232 AD2d 111,
"It is also clear that once a person's blood sample has been obtained lawfully, he can no longer assert either privacy claims or unreasonable search and seizure arguments with respect to the use of that sample. Privacy concerns are no longer relevant *118 once the sample has already lawfully been removed from the body, and the scientific analysis of a sample does not involve any further search and seizure of a defendant's person. In this [*6]regard we note that the defendant could not plausibly assert any expectation of privacy with respect to the scientific analysis of a lawfully seized item of tangible property, such as a gun or a controlled substance. Although human blood, with its unique genetic properties, may initially be qualitatively different from such evidence, once constitutional concerns have been satisfied, a blood sample is not unlike other tangible property which can be subject to a battery of scientific tests. In this regard it bears noting that the defendant's sample was contemporaneously tested against all the stain evidence seized during both investigations in a single scientific procedure."
As this Court has previously acknowledged that there is an argument to be made that an individual has a fundamentally greater privacy interest in their DNA than in physical items (and also in New York, fingerprints and "mug shot" photographs of which law enforcement maintains databases). As previously noted, defense argues that, "there's no law requiring an innocent man to forgo all constitutional rights upon an arrest only." That is simply not the case in New York. Unlike other states, such as Maryland, law enforcement in New York cannot routinely collect DNA samples upon arrest. With each increase in level of intrusion, the law in obtaining the evidence is more stringent. A physical object such as a firearm can be obtained via search warrant; an ex parte proceeding with no notice to the defendant and which occurs, generally, prior to arrest or formal charges. Fingerprints and photographs, arguably more personal, are obtained upon arrest which requires probable cause. Finally, with regards to DNA, in order for the People to obtain a buccal swab, they must file a motion with a Court of competent jurisdiction. The defendant is put on notice of the motion, is represented by counsel and entitled to make arguments opposing the motion. Ultimately, a judge must determine if the People met their burden under the three prongs in CPL §245.40(1)(e). The standard to obtain a DNA sample is exponentially higher than to obtain physical evidence or even fingerprints or photographs. While the privacy expectation is arguably greater, this is clearly balanced by the method used to lawfully obtain a DNA sample. New York also maintains a higher standard in obtaining a DNA sample than many states who collect DNA upon arrest. "By the middle of the 20th century, it was considered 'elementary that a person in lawful custody may be required to submit to photographing and fingerprinting as part of routine identification process. DNA identification is an advanced technique superior to fingerprinting in many ways." Maryland v King, 569 U.S.435, 459. 
As noted, the issue has been previously addressed by this Court and other courts throughout the state. In People v White, 60 Misc 3d 304, "The defendant retains no Fourth Amendment right or privacy interest in his DNA once it is lawfully obtained....Thus, if it has been lawfully obtained, there is no legal basis for a protective order restricting disclosure of the results of the DNA testing for any purpose other than prosecuting the defendant in this case." Also,
"In view of the foregoing, the Court finds that Defendant's motion for a protective order is moot. Defendant's DNA is already stored in CODIS because of his felony conviction, so prohibiting this sample from being uploaded to the DNA databank will have no effect. Further, the OCME is expressly permitted to compare Defendant's known DNA profile to other crime scene evidence, which does not require any "uploading" or any action that [*7]creates a danger of public exposure. As above, once a DNA sample is lawfully taken, defendants retain no Fourth Amendment privacy interest therein. Defendant's motion for a protective order is denied as moot." People v Fortuna, 78 Misc 3d 378 (2023). See also People v J.C.,
"To the extent defendant asks for a protective order in this regard, that relief is not properly before the Court given that defendant did not file a cross motion squarely requesting such affirmative relief. Even if it was, an application for a protective order would be denied on the merits (see People v Rogers, 77 Misc 3d 182, 190-194 [Sup Ct, Erie County 2022]; People v Lora, 72 Misc 3d 1223[A], *2-3 [Sup Ct, NY County 2020]; People v Belliard, 70 Misc 3d 965, 969-972 [Sup Ct, NY County 2020]; People v White, 60 Misc 3d 304, 305-310 [Sup Ct, Bronx County 2018]; see also CPL 245.40 [2]; 245.70). Defendant does not retain a Fourth Amendment privacy interest in a buccal swab sample after it is taken (see Maryland v King, 569 US 435, 463-465 [2013]; People v Rogers, 77 Misc 3d at 192-193; People v K.N., 62 Misc 3d 444, 458-459 [Crim Ct, NY County 2018])."
Once evidence is lawfully obtained, there is not artificial limitations on what law enforcement is allowed to do with the evidence. As it relates to physical evidence, once a firearm is recovered there is often further investigation concerning that piece of evidence. A firearm is routinely test-fired to determine its operability. Further, upon test firing, ballistic comparisons are routinely performed on the firearm, the bullet and the fired cartridge casings. Not only is this evidence compared on that case, but it is uploaded into NIBIN, a national ballistic database. In addition to the ballistic comparisons, firearms and firearm components lawfully obtained are also routinely tested for either fingerprints or DNA.
Fingerprints, once lawfully obtained, are uploaded and stored in a database maintained by DCJS. These fingerprints can be used for purposes beyond the case in which they were secured. They are available to be compared to crimes throughout the state. A final example would be "mug shots," obtained upon arrest. These photographs are stored in a database and used during the investigation of other crimes. They are included in subsequent photo-arrays and other police arranged photographic identifications. These mug shots are kept in a searchable database that is accessible to law enforcement for these further investigation and comparisons. 
These examples are also outlined in People v Belliard, 70 Misc 3d 965 (2020). The Court in Belliard held,
"By parity of reasoning, while law enforcement may need a search warrant to recover a firearm from a defendant's home, no further authorization is necessary to compare ballistic evidence from that firearm with ballistic evidence from unsolved crimes. Similarly, before a defendant can be compelled to provide fingerprints there must be probable cause to arrest him for a specific crime, or a court order pursuant to CPL 245.40. Yet no application to a court is required before those fingerprints may be compared with records from the Division of Criminal Justice, or with prints obtained in unsolved crimes."
The defense's arguments that his constitutional rights are violated and he would be forgoing his constitutional rights upon arrest alone fails. The process in place in New York to obtain a buccal swab preserves the defendant's constitutional rights. Further, the primary issue in deciding a request for a protective order concerns evidence that was lawfully obtained. The defendant's constitutional rights are protected up to the taking of the evidence; after, law enforcement may use that evidence to further any investigation. 
The defendant has also argued that Executive Law 995 only allows for the storage of convicted offenders. Executive Law §995-c(3)(a) states, "Any designated offender subsequent to conviction and sentencing for a crime specified in subdivision seven of section nine hundred ninety-five of this article, shall be required to provide a sample appropriate for DNA testing to determine identification characteristics specific to such person and to be included in a state DNA identification index pursuant to this article." The term "State DNA identification index" is defined in Executive Law §995(6) as "the DNA identification record system for New York state established pursuant to this article." The database referred to under this section of the Executive Law is SDIS, the second tier of CODIS. As discussed previously, SDIS has specific rules and regulations, many set forth in Executive Law §995. What is absent from Executive Law §995 is any specific mention of LDIS, although its existence and tacit approval is clearly acknowledged. See People v Mohammed, 48 Misc 3d 415, "As this court has previously held, Executive Law § 995 et seq., only applies to the New York State DNA Databank and does not apply to the OCME local databank...Thus, the Executive Law does not prohibit uploading a defendant's DNA sample into the local OCME DNA database for comparison to DNA profiles in that database...Contrary to defendant's contention, the confidentiality section, Executive Law § 995-d, which prohibits disclosure of DNA records without consent, is not applicable to the local OCME database." See also, Belliard, 970,
"The Executive Law established a commission on forensic science, tasked with "promulgat[ing] a policy for the establishment and operation of [the] DNA identification index," and empowered the commissioner of criminal justice services "to establish a computerized state DNA identification index." Executive Law §§ 995-a, 995-b, 995-c. The commission on forensic science's policy was codified in 9 NYCRR 6192, wherein the commission defines "LDIS." 9 NYCRR 6192.1(r). Nothing in part 6192 authorizes local public DNA laboratories to "index" DNA profiles, although there are two references to LDIS being able to be "searched." 9 NYCRR 6192.1(r), 6192.3(g)(1)(i). But, part 6192 contains no prohibition against such indexing either. In the 26 years since Executive Law §§ 995-a, 995-b, and 995-c were enacted, neither the commission on forensic science nor the commissioner of criminal justice services has exercised its authority to prohibit indexing within the LDIS."
Also, People v Lora, "Nonetheless, the Legislature has not spoken out against these court decisions or LDIS, nor has it amended the statute. In fact, Executive Law 49—B § 995—c(9) appears to acknowledge the existence of local DNA databases without requiring that they include only DNA records of persons convicted of a designated offense." (Citing People v White, 60 Misc 3d 304).
This Court's previous decision in Rogers reviewed other local decisions concerning the [*8]denial or granting of a protective order. Subsequent to the decision in Rogers, this Court is aware of at least three other decisions in this jurisdiction that have addressed the issue. In People v Jones, Reeves & Tucker, CR-07087-23 (February 20, 2024), Judge Ditullio, Erie County Court, denied a protective order, holding, "I'm going to deny the defense request for a protective order...can make their application under Executive Law 995-c(9)(b), if appropriate." In People v Morrison, 01864-2023 (December 29, 2023), Justice Calvo-Torres denied the defense request for a protective order, citing People v Unique Rogers and Executive Law 995-c(9)(b). Finally, in People v Coronado, 01841-2022/ Ind 70630-23/001 (May 31, 2023), Justice Wojtaszek ruled, "After careful consideration and due deliberation, I am adopting the reasoning and the holding in the case I cited earlier, People v Unique Rogers. That's at 77 Misc 3d 182, Erie County Supreme Court case from August of 2022. I am denying the defense motion for a protective order." 
The People have argued there already exist a remedy for the defendant in the event he is not charged or subsequently acquitted of the charges. The remedies already proscribed in the statute further protect an individual's privacy rights as it pertains to samples submitted to LDIS. Under Executive Law §995-c(9)(b),
"...(I)f an individual, either voluntarily or pursuant to a warrant or order of a court, has provided a sample for DNA testing in connection with the investigation or prosecution of a crime and (I) no criminal action against the individual relating to such crime was commenced with the period specified by section 30.10 of the criminal procedure law, or (ii) a criminal action was commenced against an individual relating to such crime which resulted in a complete acquittal, or (iii) a criminal action against the individual relating to such crime resulted in a conviction that was subsequently reversed or vacated, or for which the individual was granted a pardon pursuant to article two-A of this chapter, such individual may apply to the supreme court or the court in which the judgment of conviction was originally entered for an order directing the expungement of any DNA record and any sample, analyses, or other documents relating to the DNA testing of such individual in connection with the investigation or prosecution of such crime."
Executive Law §995-c(9)(a) also refers to expungement from the state DNA identification index. The statute has a clearly delineated procedure between the state DNA identification index and LDIS further emphasizing that Executive Law §995-c(3)(a) refers specifically to the state DNA identification index and not LDIS. "That §995-c(9)(b) explicitly authorizes an individual to move for expungement of his or her DNA record and related documents even when the person has not been charged with or convicted of a designated offense demonstrates that the Legislature contemplated DNA records and related documents being maintained in databases other than the New York State database, including local databases such as LDIS." People v White, 60 Misc 3d 304. Also, People v Lora, 72 Misc 3d 1223(A), "Since the defendant will be providing her DNA sample pursuant to a court order, the Executive Law permits her to later seek discretionary expungement of her DNA records. Should the action be found to be untimely filed, or the defendant acquitted, or her conviction reversed, or vacated, or she receives a pardon, she may apply for this remedy." Further, "The defendant does not have a Constitutional Fourth Amendment privacy interest in a buccal swab once it is taken." As this Court has previously found, Executive Law §995 does not prohibit lawfully obtained samples [*9]from being uploaded to the Erie County CPS Lab LDIS." 
Ultimately, the issue revolves around evidence that was lawfully obtained. A court reviews the facts of each case and hears arguments from both the People and the defense in determining whether the legal burden to obtain a buccal swab has been met. The threshold question concerns obtaining the evidence, not exploring any and all possible future uses. Great lengths are taken to maintain the privacy of the sample. Finally, a remedy to expunge the sample exists. There is no violation of the defendant's constitutional rights.
Once evidence is lawfully obtained, law enforcement is permitted to perform additional scientific testing and use the evidence for further investigative leads. "...(T)he legislature's approval by adoption of the Court of Appeals Abe A. Standard only establishes a threshold for the determination of the motion to compel the taking of a sample. The text of CPL §245.40 contains no language limiting the prosecution's use of the evidence, once that threshold is met." Belliard, 967. Once lawfully obtained, DNA is no different than fingerprints or mug shots, and if anything, is a more reliable method of identification which not only links suspects to crimes, but serves to exonerate the innocent. Finally, there are methods already proscribed by statute in Executive Law §995 allowing for the removal of a DNA profile from LDIS of an individual who is acquitted or not charged with a crime. 
Therefore, based on the foregoing as well as the Court's previous ruling in Rogers, other case law throughout New York State, the pre-existing remedies available to the defendant and the facts and circumstances of this case, the defendant's motion for a protective order is denied. 
HONORABLE M. WILLIAM BOLLER
ACTING SUPREME COURT JUSTICE
Dated: April 25, 2025
BUFFALO, NEW YORK